USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/20/2019___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

THE TRAVELERS INDEMNITY CO., et. al., :
:
Plaintiffs, :
:                    16 Civ. 8778 (LGS)
-against- :
:                    **OPINION AND ORDER**
NORTHRUP GRUMMAN CORP., et. al., :
:
Defendants. :

------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Travelers Insurance Indemnity Company ("Travelers") seeks a declaration on summary judgment that it is not obligated to provide liability insurance coverage for a lawsuit pending against Defendant Northrup Grumman Corporation ("Grumman"), *Romano et al. v. Northrop Grumman Corporation et al*, No. 16 Civ. 5760 (E.D.N.Y.) ("the *Romano* Lawsuit"). Travelers argues that Grumman did not give timely notice of the events or "occurrences" precipitating the lawsuit, a condition precedent to any coverage. For the reasons below, the motion is granted in part and denied in part.

## I.    BACKGROUND

This background summary construes disputed facts, as required, in favor of Grumman, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *accord Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).

### A.    The *Romano* Lawsuit

The *Romano* Lawsuit is a putative mass tort class action brought by residents and property owners near a former Grumman manufacturing facility, the Bethpage facility (the "Facility"), on Long Island, New York. The Second Amended Complaint, which is the operative

*Romano* Complaint, alleges that industrial waste from the Facility contaminated groundwater and soil in the nearby community, causing bodily injury and property damage.

### B. The Insurance Policies

Three categories of insurance policies, which Travelers issued to Grumman between January 1, 1968, and January 1, 1985, potentially give rise to the coverage obligations: (1) the Majority Primary Policies, (2) the Minority Primary Policies and (3) the Umbrella Policies, as defined below.

#### 1. Majority Primary Policies

The "Majority Primary Policies" refer to all primary coverage policies except two. These policies contain similar notice of "occurrence" provisions. Noncompliance with the provisions vitiates coverage. There are minor wording differences in the policies issued between 1968 and 1974 and those issued between 1975 and 1985.

##### a. Majority Primary Policies in Effect from 1968-1974

The 1968-1974 Majority Primary Policies provide:

> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company [Travelers] or any of its authorized agents as soon as practicable.

These policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The "limit of liability" provision states that, where "all bodily injury and property damage aris[e] out of continuous or repeated exposure to substantially the same general conditions[, they] shall be considered as arising out of one occurrence."

### b. Majority Primary Policies in Effect from 1975-1985

The 1975-1985 Majority Primary Policies provide:

> In the event of an occurrence resulting in bodily injury or property damage . . . written notice containing the particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured, and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

The "limit of liability" provision states, "For [the] purpose[] of determining the limit of the company's liability, all [bodily injury and property] damage[] arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The policies do not otherwise define "occurrence." Notice is deemed timely "if given within thirty days after the Insurance Manager of the named insured becomes aware of such occurrence or offense."

### 2. The Minority Primary Policies

Two policies, TR-NSL-162T582-2-78 issued in 1978 and TR-NSL-181T215-4-80 issued in 1980 (together, the "Minority Primary Policies"), have a unique notice provision:

> **Insured's Duties in the Event of Occurrence, Claim or Suit:** a. In the event of bodily injury, property damage, malpractice injury, personal injury, or advertising injury, notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. Notice shall be deemed given as soon as practicable, as respects the named insured, if given within thirty days after the Director of Insurance of the named insured becomes aware of such injury or damage.

These policies define "occurrence" as:

> [A]n event, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured . . . . For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of

3

continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

### 3. Umbrella Policies

The "Umbrella Policies" are excess insurance policies triggered when the primary policies do not apply. They contain the following notice provision:

> Written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable whenever (a) bodily injury or property damage take place, or (b) an act or omission takes place resulting in other injury or damage, which appears reasonably likely to involve this policy.

The limitation of liability provision states, "For [the] purpose[] of determining the limit of the company's liability, all [bodily injury and property] damage[] arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The Umbrella Policies do not define "occurrence."

### C.    Events at the Bethpage Facility

From the 1930s through 1990s, Grumman manufactured airplanes at the Facility, which encompassed 600 acres. The Facility had fourteen wells, from which Grumman drew groundwater for drinking, manufacturing and air conditioning. "Recharge basins" excavated in the ground held some of the Facility's industrial waste. The Facility was adjacent to the Hooker Chemical Company ("Hooker"), which disposed of industrial waste in its own lagoons.

### 1. Groundwater Contamination[1]

Around the 1970s, local regulators began investigating the Facility's groundwater, after Grumman noticed that the wells were emitting odors. In 1973, the Nassau County Department

---

[1]Because the parties focus on the alleged groundwater contamination and Bethpage Community Park contamination in their briefs, the background and analysis likewise focus on these contaminations. To the extent the *Romano* Lawsuit implicates any other contaminations, they would not alter this opinion's results. Under the Majority Primary Policies, Grumman's failure

of Health ("NCDOH") tested and found a "rapid increase" of nitrate and ammonia in some wells. Grumman previously had abandoned two wells due to odor, and in January 1974, shut down two more wells.

From 1974 through 1976, NCDOH issued findings about the groundwater. A May 1974, memorandum, copying Grumman, states that samples from both Grumman's recharge basins and a Hooker lagoon contained organic compounds, which could "be the cause of the taste and odor problems" in public supply wells.

NCDOH's May 1975, preliminary report (the "Preliminary Report") finds that the water quality at Grumman "has continued to decline to the extent that the most serious and severe instance of . . . contamination in Nassau County is now evident." Water in four wells had nitrate, ammonia and other organic compound levels approaching or exceeding allowed limits. The report further states that industrial wastes "probabl[y] contamin[ated]" the groundwater: the "discharge of sanitary and industrial wastes at and in the vicinity of the Grumman Corporation is considered responsible for the degradation in quality of Grumman Corporation wells." The report is not conclusive regarding the "nature of organic contamination and the significance of nearby sources of contamination [besides Grumman] affecting groundwater quality."

A November 5, 1975, report (the "NCDOH Report") confirms the presence of organic contaminants, like vinyl chloride and trichloroethylene ("TCE"), in Grumman's wells. It reiterates the Preliminary Report's finding that "discharge of sanitary wastes in the vicinity of the

_____

to notify Travelers of at least two contaminations or "occurrences" relevant to the *Romano* Lawsuit vitiates coverage. Under the Minority Primary Policies and Umbrella Policies, Grumman's notice obligation arose only upon the filing of the *Romano* Complaint, when Grumman first learned of *any* of the *Romano* plaintiffs' injuries. Since Grumman's notice obligation under these policies turns on when Grumman learned of such injuries, it is immaterial whether contaminations beside those discussed here contributed to the injuries.

Grumman Corporation and the discharge of industrial wastes, particularly those previously discharged by the Hooker Chemical Corporation, is considered responsible for the degradation in quality of Grumman Corporation wells." In the mid-1970s, Grumman replaced a tank at the Facility leaking TCE. Grumman later found TCE in four Grumman wells and a recharge basin in April 1976.

In January 1976, NCDOH told Grumman that it had asked the federal Environmental Protection Agency ("EPA") and the New York state health department what the "public health significance of the detected contaminants" was.

In June 1976, NCDOH recommended to Grumman, based on updated well sampling results, that Grumman not use certain Facility wells for consumption, find an alternative water source and retain a groundwater consultant. The consultant, Geraghty & Miller, issued a report (the "G&M Report") the same month. The report hypothesizes that the "sources of the contamination [are the] basins, lagoons, spills . . . [which] created a slug of contaminated ground water in the shallow aquifer underlying at least part of the [Grumman] plant." The report does not mention Hooker. It further advises "Grumman to obtain their entire potable supply from Bethpage Water District['s]" municipal supply, instead of the Facility's wells. It concludes that, even if Grumman were to pursue the most proactive course, complete abatement of the contamination may not be possible and the contamination may spread to neighboring wells.

### 2. Soil Contamination in and around the Park

The Bethpage Community Park (the "Park") is adjacent to the Facility. In 1962, Grumman donated an 18-acre parcel of the Facility to the neighboring town of Oyster Bay (the "Town"), which developed the parcel into the Park.

In 1997, Grumman found polychlorinated biphenyls ("PCBs") on a private road, owned by Grumman, which abuts the Park and private properties. PCBs are a byproduct of the Facility's manufacturing. By mid-2001, Grumman became aware that soil "on the fringe of Park property" had concentrations of PCBs that exceeded recommended levels.

A May 2001, Grumman internal presentation states that the "Source of Contamination" may be the "fill material [used in the Park grounds] derived from scrapings from the [Facility's] recharge basins." The presentation concludes that "implications of PCB contamination within the Park itself are enormous" and include "tort claims." Grumman notified NYSDOH and the New York State Department of Environmental Conservation ("NYSDEC") of these findings in late 2001. An April 2002 internal presentation reiterates that PCBs and various metals in Park samples exceeded regulatory standards, therefore "Tort Claims Are a Possibility." A NYSDEC regulator stated in the same month that "the risks are low enough so that there's no concern about using the park."

On April 30, 2002, Grumman notified the Town of potential Park contamination. The Town closed the Park on May 2, 2002. In June 2002, more than 900 local residents attended a public meeting, where they "voiced" their significant "public concern." Around this time, Grumman wrote to its insurance broker in May 2002 about "Possible Environmental Claims" concerning "residential housing" and "a piece of commercial property" near the Park.

**D.     Grumman's Notice to Travelers**

Grumman argues it provided notice to Travelers twice in the 1970s regarding potential groundwater contamination. First, during a December 6, 1976, meeting, Grumman gave Travelers a five-page document called "Municipal Water Tie-in Bethpage Complex," which lays out the timetable for Grumman to convert its drinking water supply from the Facility wells to the

municipal water system. Second, during a January 17, 1977, meeting, Grumman gave Travelers a copy of a NCDOH letter that summarizes the "key points of discussion" from a meeting between Grumman and NCDOH. One point concerns the "presence and the implications of organic compounds in the water supply at . . . [the] Bethpage facility."

Regarding Park contamination, Grumman argues that it provided written notice to Travelers on October 10, 2002, in a letter seeking indemnification. Grumman enclosed NYSDEC letters that discuss the "levels of PCB and metals contamination [at the Park] which allegedly exceed federal and state cleanup objectives for soils."

On August 7, 2015, Grumman forwarded to Travelers a solicitation letter from two law firms, seeking Bethpage area residents to serve as plaintiffs for a "property damage" and "personal injury" lawsuit (the "Solicitation Letter"). This letter was a precursor to the *Romano* Lawsuit. On August 26, 2015, Travelers responded that Grumman's forwarding the letter did not constitute "a specific demand for compensation or other relief on behalf of any Bethpage residents." Travelers "reserve[ed] all . . . rights and defenses with regard to any future review of the matter."

The *Romano* plaintiffs commenced the *Romano* Lawsuit on September 13, 2016, when they filed the original Complaint. On September 28, 2016, Grumman sent Travelers a copy of the *Romano* Complaint, which Travelers received on September 29, 2016. The Complaint was forwarded to the appropriate claims handler on September 30, 2016. Two Travelers representatives, including its Rule 30(b)(6) witness, testified at their depositions that Grumman gave timely notice of the Complaint.

### E. Travelers' Initial Coverage Determination

Travelers sent Grumman an "Initial Coverage Determination" letter for the *Romano* Lawsuit on October 29, 2016. The letter states that, while the 1968-72 policies are "potentially applicable" to the *Romano* Lawsuit, Travelers denies coverage based on the pollution exclusions in the policies. It also "expressly reserves the right to supplement [the reasons for Travelers'] declination should circumstances warrant." The letter "incorporates by reference and expressly reserves the right to assert all of the claims and defenses" that Travelers asserted in *Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12 Civ. 3040 (S.D.N.Y) (KBF) ("*Grumman I*"), including a late notice defense.

Travelers also forwarded the *Romano* Complaint to its outside insurance counsel at Simpson, Thacher & Bartlett LLP on September 30, 2016, a day after receiving the Complaint. On November 11, 2016, following outside counsel's advice, Travelers commenced this declaratory judgment action.

### F. The *Grumman I* Litigation

This action is related to *Grumman I*, litigated between the same parties. In that action, Travelers sought a declaratory judgment that it was not obligated to cover environmental cleanup or "remediation" claims, brought by NYSDEC, the Town and various water districts, for contamination around the Facility. Grumman cross-claimed for coverage.

Travelers argued at summary judgment that it had no coverage obligation based on the pollution exclusions and late notice defense under the policies. In March 2014, Judge Forrest granted Travelers' motions for summary judgment. Regarding late notice, the court stated that "[t]here is no triable issue that notice was due as to an occurrence by the late 1970s." *Grumman I,* 3 F. Supp. 3d 79, 112 (S.D.N.Y. 2014). The Second Circuit affirmed all of the *Grumman I*

summary judgment opinions. *See Travelers Indem. Co. v. Northrop Grumman Corp.*, 677 Fed. App'x 701 (2d Cir. 2017).

## II. STANDARD

Summary judgment is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Victory v. Pataki*, 814 F.3d 47, 58–59 (2d Cir. 2016). Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pippins v. KMPG, LLP*, 759 F.3d 235, 252 (2d Cir. 2014) (quoting *Anderson*, 477 U.S. at 248).

## III. DISCUSSION

Summary judgment is granted to Travelers under the Majority Primary Policies. Travelers has no coverage obligation because Grumman failed to give timely notice of the relevant "occurrences" and Travelers' disclaimer of coverage was timely under these policies. Summary judgment is denied as to the Minority Primary Policies and Umbrella Policies. Grumman's notice under these policies was timely.

## A.     Grumman's Notice Obligations

The Travelers policies impose different notice obligations.  While the Majority Primary Policies require notice of an "occurrence" resulting in injury, the Minority Primary Policies and Umbrella Policies only require notice of injuries themselves.  Grumman complied with the latter, but not the former, obligation.

### 1.  Legal Standards

Under New York law,[2] compliance with the notice provisions in insurance policies, issued before 2009, "is a condition precedent to an insurer's liability under the policy," regardless of whether noncompliance prejudiced the insurer.  *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995); *Indian Harbor Ins. Co. v. City of San Diego*, 972 F. Supp. 2d 634, 648 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 726 (2d Cir. 2014) (explaining that the New York statute requiring an insurer to show prejudice due to untimely notice applies only for insurance policies issued after 2009).  Whether an insured's notice of occurrence is timely depends on (1) when the insured's notice obligation arose and (2) whether the insured gave notice within a reasonable period of time.  *See Olin Corp. v. Ins. Co. of N. Am.*, 966 F.2d 718, 723 (2d Cir. 1992); *Great Canal Realty Corp. v. Seneca Ins. Co.,* 833 N.E.2d 1196, 5 N.Y.3d 742, 743 (N.Y. 2005) ("Where a policy of liability insurance requires that notice of an occurrence be given 'as soon as practicable,' such notice must be accorded the carrier within a reasonable period of time.").

Even if notice is late, "circumstances may exist that will excuse or explain the insured's

---

[2] New York law governs the insurance policies.  The parties have assumed that New York law applies throughout the litigation.  *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (Because "the parties' briefs assume that [a given] state law governs," such "implied consent is sufficient to establish the applicable choice of law.")

delay in giving notice, such as lack of knowledge that an accident has occurred," *Osorio v. Bowne Realty Assocs., LLC*, 35 N.Y.S.3d 213, 215 (2d Dep't 2016) (internal alterations omitted), or a "reasonable belief in nonliability," *Ramlochan v. Scottsdale Ins. Co.*, 55 N.Y.S.3d 369, 371 (2d Dep't 2017). "The sufficiency of an excuse ordinarily presents a question of fact to be determined at trial." *Albano-Plotkin v. Travelers Ins. Co.*, 955 N.Y.S.2d 612, 614 (2d Dep't 2012). "Nevertheless, the issue of whether an insured's excuse for the delay is reasonable may be determined as a matter of law where the evidence, construing all inferences in favor of the insured, establishes that the belief was unreasonable or in bad faith." *Rockland Exposition, Inc. v. Marshall & Sterling Enters., Inc.*, 31 N.Y.S.3d 139, 143 (1st Dep't 2016) (internal quotations omitted).

## 2. The Majority Primary Policies

### a. Interpretation of "Occurrence"

The Majority Primary Policies require "written notice" in the event of an "occurrence." The 1968-1974 policies define occurrence as an "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended [by] the insured." The 1976-1985 policies do not define "occurrence" expressly, but state that written notice is required for an "occurrence resulting in bodily injury or property damage." All Majority Primary Policies provide that "bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising from one occurrence."

In *Olin*, the Second Circuit interpreted substantially similar policy language, and concluded that the relevant test for when a notice of occurrence obligation arises is when the insured has "sufficient information reasonably to apprehend that a colorable claim of injury"

could be made, *not* when the insured "learns of a particular identified injury" or "particular identified claims." *See Olin*, 966 F.2d at 723-24.  The *Olin* policy defined "occurrence" as "an event or continuous exposure to conditions, which unexpectedly causes injury."  The policy grouped "exposure to substantially the same general conditions [as] one occurrence." *Id.* at 724. The Second Circuit rejected the argument that, simply because the policy defined "occurrence" as an "exposure to conditions . . . *caus[ing] injury*," then occurrence only arose upon "injury." *See id.* at 723-24.  "Caus[ing] injury" merely described the type of exposure that triggers notice, *i.e.* an exposure capable of injuring.  *See id.*  Under this test, the Second Circuit found that the relevant "occurrence" in *Olin* was the "DDT contamination" of a local water source after DDT leaked from the insured's plant.  *Id.* at 724.

The *Olin* test applies to the Majority Primary Policies.   Like the *Olin* policy, these policies define "occurrence" as an "exposure" to injurious "conditions."   They also contain the critical grouping language that "continuous or repeated exposure to substantially the same general conditions shall be deemed one occurrence."

That the grouping language is prefaced with "[f]or the purpose of determining the limit of the company's liability" is immaterial.  The term "occurrence" should be interpreted consistently throughout the Majority Primary Policies.  Unless there is a "*clear* indication that different meanings were intended" in different parts of the policies, such as through express restrictions ("*only* for the purpose of . . ." or "for the *sole* purpose of . . ."), the "[t]erms in a document, especially terms of art, normally have the same meaning throughout the document." *Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997), *as amended* (Nov. 18, 1997) (an "occurrence" in a notice provision should be construed consistently with "occurrence" in a grouping provision in insurance policies); *accord U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 569

B.R. 12, 23 (S.D.N.Y. 2017).  Because the Majority Primary Policies do not have such express restrictions, the grouping provision informs how "occurrence" should be interpreted for notice purposes.

### a.  The Relevant Occurrences

Grumman was required to notify Travelers of at least two distinct "occurrences" underlying the *Romano* Lawsuit: one related to groundwater contamination and the other to soil contamination in and around the Park.

As discussed, the Majority Primary Policies treat "continuous or repeated exposure to substantially the same general conditions" as "one occurrence."  Although the groundwater and soil contamination may trace back to Grumman's industrial waste disposals, these contaminations are separate occurrences.  They resulted from distinct courses of events that injured victims and property through distinct channels.  *See Olin*, 966 F.2d at 723-24 (under a policy with similar grouping language, a water contamination is a single occurrence where it injured parties through the same local water supply although at different times and in different places). The groundwater contamination was purportedly caused by Facility contaminants leaching into an underlying aquifer, therefore injuring parties through the local water supply.  By contrast, the soil contamination injured victims and property in close proximity to the Park.  The contaminations are unique "exposures" to different sets of "conditions."

The contaminations also do not amount to more than two "occurrences."  Grumman argues, citing *Appalachian Ins. Co. v. Gen. Elec. Co.*, 863 N.E.2d 994, 8 N.Y.3d 162 (N.Y. 2007), that each individual plaintiff's exposure to contaminations are separate "occurrences."  As a result, Grumman's notice obligation arose only when it learned of each individual plaintiff's injury from the *Romano* Complaint.  This argument is unpersuasive.  First, *Appalachian*

*Insurance* is distinguishable because its policies lack the critical grouping language in the Majority Primary Policies and *Olin* policy. The court in *Appalachian Insurance* noted that "these sophisticated parties could have chosen to define occurrence in a manner that grouped incidents . . . [b]ut they did not do so." *Appalachian Insurance*, 8 N.Y.3d at 173. As a result, "each individual plaintiff's . . . exposure to asbestos" is a distinct "incident" which cannot be grouped into a single "occurrence." *Id.* at 173-74 (internal quotation marks omitted). Second, Grumman's argument contradicts *Olin*. As discussed, under policies substantially similar to the Majority Primary Policies, the Second Circuit found that an "occurrence" arose when the insured had sufficient information that a "contamination" may cause injury, not when it knew particular that plaintiffs were injured. *See Olin*, 966 F.2d at 723-24.

### b. Grumman Failed to Give Timely Notice of the Groundwater Contamination.

Regarding groundwater contamination, Grumman's notice obligation was triggered by June 1976, but the earliest Grumman notified Travelers was December 1976. This nearly six-month delay is untimely as a matter of law.

Grumman's notice obligation arose by June 1976. By that time, Grumman knew from regulator and consultant reports that the groundwater was contaminated, Grumman was a likely source of contamination, the contamination could pose health risks, Grumman should look for an alternative drinking water supply other than the Facility wells, and finally even aggressive remedial measures may not wholly abate the contamination. Based on these undisputed facts, no reasonable jury could conclude that in June 1976, Grumman lacked "sufficient information reasonably to apprehend that a colorable claim of injury" could be made against it. *See Olin*, 966 F.2d at 724. Specifically:

- By 1973, Grumman shut down two wells due to taste and odor problems.

- By May 1974, NCDOH's sampling "reveal[ed] several types of organics which could be the cause of the taste and odor problems" in the wells. Grumman also knew the groundwater had high levels of nitrates and ammonia.

- By 1975, the Preliminary Report and NCDOH Report found that (1) the degradation of Facility area groundwater was "the most serious and severe instance of . . . contamination in Nassau County," and that (2) waste discharges "in the vicinity of the Grumman Corporation . . . [were] considered responsible for the degradation."

- By June 1976, Grumman knew that NCDOH had asked the EPA and the state health department regarding the public health significance of the detected contaminants, and that Grumman wells and a recharge basis had TCE.

- In June 1976, NCDOH recommended that Grumman no longer use certain wells for its potable water supply. The G&M Report also found that the "sources of contamination consist[ed] of basins, lagoons, spills, etc. have created a slug of contaminated ground water in the shallow aquifer underlying at least part of the [Grumman] plant." The G&M Report further states that, even if Grumman were to take the most proactive approach, the "[c]ontamination may spread off the property and affect neighboring wells."

The totality of these facts shows that by June 1976, Grumman reasonably understood that it could be responsible for a "severe" contamination spreading into the local water supply. It therefore knew it may have liability for the contamination.

Although Grumman's notice obligation arose in June 1976, Grumman did not give notice until December 1976, at the earliest. Assuming without deciding that the December 1976 notice was adequate, this nearly six-month delay is unreasonable as a matter of law. *See New York Univ. v First Fin. Ins. Co.*, 322 F3d 750, 756 (2d Cir. 2003) (collecting cases) ("[W]hen the

delay is both two months or longer *and* unexplained," it is "unreasonable as a matter of law.");

*Cruz v. W. Heritage Ins. Co.*, 41 N.Y.S.3d 897, 898 (1st Dep't 2016) (The "[p]laintiff's

unexplained delay of at least two months in notifying defendant of the underlying personal injury

action against him constitutes late notice as a matter of law."); *Vale v. Vermont Mut. Ins. Grp.*,

977 N.Y.S.2d 117, 120 (3d Dep't 2013) ("[D]efendant made a prima facie showing of its

entitlement to judgment as a matter of law based upon plaintiff's nearly five-month delay" in

giving notice of an occurrence); *Temple Const. Corp. v. Sirius Am. Ins. Co.*, 837 N.Y.S.2d 689,

692 (2d Dep't 2007) (five-month delay in providing notice of an occurrence is unreasonable as a

matter of law).

Grumman argues that its delay should be excused because in June 1976, it did not believe

it had liability for groundwater contamination. But even "construing all inferences in favor of

the insured," this belief is not reasonable and cannot excuse its delayed notice. *See Rockland*

*Exposition*, 31 N.Y.S.3d at 143.

Despite the undisputed evidence of regulators' concerns by June 1976, Grumman argues

that "no regulatory entity or anyone else was threatening to bring a claim." Therefore, Grumman

reasonably believed that it had no liability at that time. But the absence of formal legal action

does not make a belief of nonliability reasonable. Courts generally require an insured to receive

*affirmative* assurances that it is not a responsible party for a triable issue to arise over a belief of

nonliability. *See, e.g., Kambousi Rest., Inc. v. Burlington Ins. Co.*, 871 N.Y.S.2d 129, 131

(2009) (insured had a good faith belief of no liability because the spouse of the injured party told

the insured, "he should not worry and that his wife had tripped over her [own] shoelaces");

*Jordan Const. Prods. Corp. v. Travelers Indem. Co. of Am.*, 789 N.Y.S.2d 298, 299-300 (2d

Dep't 2005) (insured "raised a triable issue of fact as to whether its delay in giving notice of the

occurrence to Travelers was reasonably founded . . . upon the injured party's purported representation that he did not intend to sue"); *25th Ave, LLC v. Delos Ins. Co.*, 922 N.Y.S.2d 204, 207 (2d Dep't 2011) (there was a triable issue over belief of no liability after an insured learned that a party "was fine and had returned to work"). Grumman received no such assurances. To the contrary, it was aware of regulators' concerns, including that they had labeled the contamination "severe," sought guidance from state and federal regulators about public health risks and recommended Grumman stop using certain wells. Grumman's own consultant advised that it both switch to an alternative water source due to the "potential adverse health effect," and that the contamination may reach neighboring wells and the underlying aquifer.

Grumman further argues that its delay should be excused because it believed Hooker Chemical was the source of contamination, not Grumman. This belief is also unreasonable. Although regulators pointed to Hooker as a possible source of some contamination, they consistently identified Grumman as a potential source. For example, the May 1974 NCDOH memorandum confirmed that organic compounds found in the groundwater were in Grumman's recharge basins, not just Hooker's lagoons. The May 1975 Preliminary Report identified Grumman's "recharge basins" as a source of contamination. In June 1976, Grumman learned that TCE, which Grumman used for manufacturing, was in its recharge basins. The G&M Report also hypothesizes that contaminants leaching from the "basins, lagoons, [and] spills" on Grumman's property contaminated the groundwater at and around the Facility. The G&M Report does not mention Hooker. As Judge Forrest already held in *Grumman I*:

> It is certainly true, and undisputed, that Hooker Chemical Corp. was considered to be a source of contamination in the 1970s. However, in light of the extensive contamination, the history of Grumman's own testing efforts and results, and the reports from its own environmental consultants, there is no triable issue as to whether it was reasonable for Grumman to assert a belief in non-liability to

excuse late notice: a belief in non-liability was unreasonable based on the factual record.

*Grumman I*, 3 F. Supp. 3d at 113.

### c. Grumman Did Not Give Timely Notice of the Soil Contamination.

Regarding Park soil contamination, Grumman's notice obligation arose by May 2001, but Grumman did not notify Travelers of this occurrence until October 2002, at the earliest. This nearly one-and-a-half-year delay is untimely as a matter of law.

By May 2001, Grumman had "sufficient information to apprehend that a colorable claim of injury" might be made against it. *See Olin*, 966 F.2d at 724. As Grumman internally acknowledged, the PCB concentrations in Park soil samples exceeded regulatory standards, with "enormous" "implications," including "tort claims."

Even assuming that Grumman's notice obligation did not arise in May 2001, the latest possible time that Grumman was required to give notice was June 2002. Grumman's October 2002, notice would still be untimely from this point. By June 2002, the Town closed the Park, Grumman learned of significant public concern about the Park and Grumman notified its insurance broker that it may be liable for affected properties adjacent to the Park. Grumman also reiterated in a May 2002, internal presentation that "Tort Claims Are a Possibility" and that Grumman should "Place Insurers on Notice" of potential claims.

Whether measured from the initial notice point in May 2001 or the latest possible point in June 2002, Grumman's purported October 2002, notice is untimely. *See, e.g., Lobosco v. Best Buy, Inc.*, 915 N.Y.S.2d 305, 307-08 (1st Dep't 2011) (a four-month delay in providing notice, absent valid excuse, was untimely as a matter of law); *McGovern-Barbash Assocs., LLC v. Everest Nat. Ins. Co.*, 914 N.Y.S.2d 218, 221 (1st Dep't 2010) (same); *Juvenex Ltd. v.*

*Burlington Ins. Co.*, 882 N.Y.S.2d 47, 48 (1st Dep't 2009) (a two-month delay is untimely as a matter of law).  Grumman does not explain or justify its delay.

### 3.   The Minority Primary Policies

The Minority Primary Policies require notice "in the event of a bodily injury, property damage . . . [or] personal injury."  The plain meaning of this provision is that an insured must give notice of injuries themselves, and not of any prior incidents resulting in injury, as the Majority Primary Policies require.  *See Burlington Ins. Co. v. NYC Transit Auth.,* 79 N.E.3d 477, 481 (N.Y. 2017) ("[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.").  Under this standard, Grumman's notice obligation arose when it first learned of the *Romano* plaintiffs' injuries from the original Complaint, filed on September 28, 2016.  Grumman provided Travelers with the Complaint within two weeks.  As Travelers' own 30(b)(6) witness and claims handler testified, this notice was timely.  Grumman satisfied its notice obligations under the Minority Primary Policies.

Travelers argues unavailingly that, because the notice provision is entitled "Insured's Duties in the Event of Occurrence, Claim, or Suit," Grumman was required to give notice of an occurrence.  But Travelers entirely ignores the body of the provision to make this argument.  In construing a contract provision, a court must "interpret its parts with reference to the whole." *Eitan Ventures, LLC v. Peeled, Inc.*, 943 N.Y.S.2d 449, 451 (2012).  Reading the title and body of the notice provision together, the title signals only the general topic, but provides no actual direction for what an insured must do "in the Event of Occurrence, Claim, or Suit."  Only the body provides this direction.  In the event of an "Occurrence," the body explains that an insured need only give notice if and when particular injuries result.  Otherwise, no notice is required of

20

the events precipitating injury.

### 4. The Umbrella Policies

Grumman also provided timely notice to Travelers under the Umbrella Policies. Like the Minority Primary Policies, these policies only require "written notice . . . whenever . . . bodily injury or property damage takes place." The same analysis therefore follows. Grumman's notice obligation was triggered when it learned of plaintiffs' injuries from the *Romano* Complaint. Travelers admitted that Grumman timely sent the Complaint. Grumman therefore satisfied its notice obligation under the Umbrella Policies.

### B. Timeliness of Travelers' Coverage Denial Based on Late Notice

Grumman argues that the motion for summary judgment should be denied because Travelers' disclaimer of coverage was untimely. This argument is rejected. Travelers' disclaimer of coverage was timely as a matter of law.

### 1. Legal Standards

Under New York Law, for "bodily injury claims arising out of a New York accident and brought under a New York liability policy," New York Insurance Law § 3420(d)(2) requires the insurer make a timely disclaimer of coverage. *KeySpan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 15 N.E.3d 1194, 23 N.Y.3d 583, 590 (N.Y. 2014). If the insurer fails to do so, "it is precluded from later successfully disclaiming coverage." *NGM Ins. Co. v. Blakely Pumping, Inc.*, 593 F.3d 150, 153 (2d Cir. 2010) (citing *Hartford Ins. Co. v. Cty. of Nassau*, 389 N.E.2d 1061 (N.Y. 1979)); *accord Webster ex rel. Webster v Mount Vernon Fire Ins. Co.*, 368 F3d 209, 215 (2d Cir. 2004) ("Once the insurer became obligated to disclaim within a reasonable time, its failure to do so estopped it from later denying coverage, even though the insurer would have otherwise been entitled to deny coverage based on the insured's failure to give timely notice.");

*KeySpan*, 23 N.Y.3d at 590 (internal citations and alterations omitted) (Section 3420 "establishes an absolute rule that unduly delayed disclaimer of liability or denial of coverage violates the rights of the insured or the injured party.").

The disclaimer obligation arises when "the insurer has sufficient knowledge of facts entitling it to disclaim, or knows that it will disclaim coverage." *Country-Wide v. Preferred Trucking Servs. Corp.*, 6 N.E.3d 578, 581 (N.Y. 2014); *see Republic Franklin Ins. Co. v. Pistilli*, 791 N.Y.S.2d 639, 641 (2d Dep't 2005) (the disclaimer obligation arises as soon as an insurer has a "reasonable basis upon which to disclaim coverage," and an insurer cannot wait to disclaim "until all issues of fact regarding the insurer's coverage obligations have been resolved"). The insurer has no obligation until it is notified of a claim for which the "insured will seek coverage." *Webster*, 368 F.3d at 216 (citing *Travelers Ins. Co. v. Volmar Const. Co.*, 752 N.Y.S.2d 286, 290 (1st Dep't 2002)). Once the obligation arises, the insurer must notify a policyholder in writing of a disclaimer "as soon as is reasonably possible." § 3420(d)(2); *Country-Wide*, 6 N.E.3d at 581 (N.Y. 2014). But any "delay occasioned by a reasonably prompt, thorough, and diligent investigation of the claim does not render the insurer's disclaimer untimely, because an investigation is often necessary to determine whether there is any basis for disclaiming coverage." *Webster*, 368 F3d at 216-17 (internal quotation marks omitted); *accord First Fin. Ins. Co. v Jetco Contr. Corp.*, 1 NY3d 64, 69 (2003).

### 2. When Travelers' Disclaimer Obligation Arose

Travelers' disclaimer obligation arose when its claims handler received the *Romano* Complaint on September 30, 2016. At that time, Travelers had "sufficient facts" regarding the bodily injury claims for which Grumman would seek coverage. It also had the facts necessary for disclaimer based on late notice. Specifically, Travelers had the *Romano* Complaint, the

applicable insurance policies and the *Grumman I* rulings which, among other things, determined that Grumman was required to notify Travelers of Facility area contamination by the late 1970s. *See Grumman I,* 3 F. Supp. 3d at 112. Travelers' Initial Coverage Determination letter states that it relied on "the *Romano* Lawsuit, the language of Northrop Grumman's policies, the [*Grumman I*] District Court's prior rulings as well as the applicable law" in reaching its determination. Travelers possessed all of these materials by September 30, 2016.

Grumman argues that Travelers was required to disclaim coverage "long before" the *Romano* Complaint was filed, because "Travelers had all the information" for its late notice defense decades earlier. Specifically, Travelers' disclaimer obligation arose by the 1970s when Travelers learned of groundwater contamination, again in the 1980s and 1990s when it learned more about the contamination and in 2015 when Travelers received a copy of the Solicitation Letter. These arguments are unpersuasive. Under § 3420(d)(2), an "insurer can hardly be said to have sufficient facts to issue a disclaimer" before it is reasonably aware of particular bodily injuries from which claims may arise. *Webster*, 368 F.3d at 216. Although this point may come before a formal lawsuit is filed in court, all of Grumman's cases recognize a disclaimer obligation only *after* the insurer received notice of particular bodily injuries. *See, e.g., U.S. Underwriters Ins. Co. v. City Club Hotel, LLC,* 369 F.3d 102, 105 & 109 n.8 (2d Cir. 2004) (obligation arose when insured forwarded letter to insurer from an injured party's attorney, who was "retained to pursue personal injury claims" for his client's fall on insured's property); *Pearson Capital Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 406 (S.D.N.Y. 2015) (disclaimer obligation arose when insurer received a "demand for defense and indemnification" for a bodily injury claim); *Mount Vernon Fire Ins. Co. v. Gatesington Equities, Inc.*, 611 N.Y.S.2d 893, 894 (2d Dep't 1994) (disclaimer obligation arose when insurer received

"the first notification of loss" from an elevator accident). Grumman's cases do not help its arguments.

At none of the earlier disclaimer points that Grumman proposes did Travelers have information of particular bodily injuries. The Solicitation Letter was *looking* for parties with these injuries. Even if Travelers was aware of groundwater contamination years before the *Romano* Complaint, it was not obligated to disclaim coverage preemptively. Critically, the timing of *Travelers*' disclaimer of coverage obligation is not selfsame with the timing of *Grumman*'s notice of occurrence obligation under the Majority Primary Policies. *See, e.g., Volmar Const. Co.*, 752 N.Y.S.2d at 290 ("That [the insurer] received notice of the occurrence shortly after it occurred . . . was insufficient to trigger [its] time to issue a disclaimer . . . [when the insurer] had no reason to expect that [the insured] was seeking coverage under its policy.")

### 3. When Travelers Effectively Disclaimed Coverage

Once Travelers' disclaimer obligation arose on September 30, 2016, it disclaimed coverage forty-two days later, by filing this action on November 11, 2016.

Travelers' October 29, 2016, disclaimer based on the pollution exclusions cannot serve as a disclaimer for late notice. "[T]he notice of disclaimer must promptly apprise the claimant with *a high degree of specificity of the ground or grounds* on which the disclaimer is predicated." *General Accident Insurance Group v. Cirucci*, 387 N.E.2d 223, 225 (N.Y. 1979) (construing an identically worded provision as § 3420(d)(2)) (emphasis added). The New York Appellate Division courts have consistently applied this rule to § 3420(d)(2). *See, e.g., Ability Transmission, Inc. v. John's Transmission, Inc.*, 55 N.Y.S.3d 367, 368–69 (2d Dep't 2017) ("An insurer's justification for denying coverage is strictly limited to the ground stated in the notice of disclaimer"); *Clayburn v. Nationwide Mut. Fire Ins. Co.*, 871 N.Y.S.2d 487, 488 (3d Dep't

2009); *Adames v. Nationwide Mut. Fire Ins. Co.,* 866 N.Y.S.2d 210, 212 (2d Dep't 2008); *City of Kingston v. Harco Nat'l Ins. Co.*, 848 N.Y.S.2d 455, 457 (3d Dep't 2007).

Travelers argues that the October 29, 2016, disclaimer is sufficient because it incorporated the late notice defense by reference. The disclaimer states, "Travelers also incorporates by reference and expressly reserves the right to assert all of the claims and defenses asserted in Travelers' Complaint for Declaratory Judgment and Travelers' Reply to Counterclaims of Northrop Grumman Systems Corporation [in *Grunman I*]." But this statement does not discuss the late notice defense with the "high degree of specificity" required in a proper disclaimer. Furthermore, the reservation of Grumman's right to assert the defense suggests that Grumman had not formally asserted the defense yet. *See Hartford Ins. Co.*, 389 N.E.2d at 1062 (a reservation of rights cannot resolve "the question of whether the insurer has timely sent a notice of disclaimer"); *accord Philadelphia Indem. Ins. Co. v. Intrepid Grp.*, LLC, No. 16 Civ. 7928, 2018 WL 1517199, at *6 (S.D.N.Y. Mar. 26, 2018). Regardless, whether Travelers disclaimed coverage on October 29, 2016, or November 11, 2016, its disclaimer was timely.

### 4. Timeliness of Disclaimer

Travelers' disclaimer for late notice, forty-two days after its obligation arose, was timely. A disclaimer must be made "as soon as was reasonably possible," which "is necessarily [a] case-specific" question and ordinarily a question of fact. *Country-Wide*, 6 N.E.3d at 576, 581. In exceptional circumstances, "this question may be decided without the benefit of a jury." *U.S. Underwriters,* 369 F.3d at 107. Courts have determined on summary judgment that a delay of over forty days is reasonable, where an insurer needed to undertake "a thorough and diligent investigation into whether it had grounds for disclaimer based on late notice." *Tully Const. Co.,*

*Inc. v. TIG Ins. Co.*, 842 N.Y.S.2d 528, 531 (2d Dep't 2007).  Resolving the question "depends on all the facts and circumstances, especially the length of and the reason for the delay." *U.S. Underwriters*, 369 F.3d at 107 (quoting *Hartford Ins. Co.*, 389 N.E.2d at 1061; *accord Northfield Insurance Company v. Queen's Palace, Inc.*, 2017 WL 1957475 (E.D.N.Y. 2017)).

This case presents exceptional circumstances where the timeliness of Travelers' disclaimer can be decided on summary judgment.  None of the facts accounting for the forty-two-day period before Travelers disclaimed coverage are in dispute.  Travelers was considering its defenses and consulting with outside counsel.  The late notice defense and the *Romano* Lawsuit are complex, and involve analyses of events covering several decades and the implications of *Grumman I* opinions running several hundred pages.

No reasonable factfinder could conclude, under these circumstances, that it was unreasonable for Travelers to take forty-two days to determine whether it could disclaim coverage based on late notice.  In *Tully*, the Second Department affirmed a summary judgment ruling that a forty-two-day period before a coverage disclaimer was reasonable.  The *Tully* insurer had to "conduct[] an investigation before disclaiming based on late notice" by reviewing relevant court filings and the insurance policy.  *Tully Const.*, 842 N.Y.S.2d at 531.  Any "delay occasioned by a reasonably prompt, thorough, and diligent investigation of the claim does not render the insurer's disclaimer untimely."  *Webster*, 368 F.3d at 216-17;  *see also Mount Vernon Fire Ins. Co. v. Harris*, 193 F. Supp. 2d 674, 678 (E.D.N.Y. 2002) (fifty-day delay to disclaim coverage was "reasonable as a matter of law" on summary judgment, as the insurer was "conducting [a] thorough investigation[]"); *Farmbrew Realty Corp. v. Tower Ins. Co. of New York*, 734 N.Y.S.2d 592, 289 A.D.2d 284, 285 (2d Dep't 2001) (affirming summary judgment holding that fifty-eight-day delay for a disclaimer was "reasonable as a matter of law"); *Brooklyn Hosp.*

*Ctr. v. Centennial Ins. Co.*, 685 N.Y.S.2d 267, 258 A.D.2d 491, 492 (2d Dep't 1999) (forty-three-day delay in disclaiming coverage was reasonable on summary judgment given that the claim concerned events occurring two decades prior); *DeSantis Bros. v. Allstate Ins. Co*., 664 N.Y.S.2d 7, 244 A.D.2d 183, 184 (1st Dep't 1997) (thirty-one days were reasonable because counsel needed to review a 500-page file and conduct legal research to disclaim coverage). Travelers was engaging in the same complex investigation here. Its disclaimer of coverage was timely as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, Travelers' summary motion is GRANTED in part and DENIED in part. The Court hereby declares that Travelers has no coverage obligation for the *Romano* Lawsuit under the Majority Primary Policies. Summary judgment is denied as to the Minority Primary Policies and the Umbrella Policies.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 208.

Dated: September 20, 2019
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE